# In the United States Court of Federal Claims

No. 14-1225C

(E-Filed: December 6, 2016)[1]

| | | |
|---|---|---|
| PROGRESSIVE INDUSTRIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | Post-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; Technical Proposal Evaluation; Source Selection Plan; Unequal Treatment; Injunctive Relief. |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |
| v. | ) ) | |
| IRISH OXYGEN CO., | ) ) | |
| Defendant-Intervenor. | ) ) | |

Michelle F. Kantor, Chicago, IL, with whom was Jerome W. Cook, for plaintiff.

Antonia R. Soares, with whom were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Robert E. Kirschman, Jr., Director, Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

Kevin S. Sandstrom, Stillwater, MN, for defendant-intervenor.

---

[1]    This Opinion and Order was originally filed under seal on October 31, 2016.  See ECF No. 120.  The court requested the parties to file a motion by November 14, 2016, if either party believed that the Opinion and Order should be redacted before publication. Defendant filed a motion to redact by that date, requesting that the court redact the names of nonparty offerors.  Accordingly, the court limited its redactions to redact the names of nonparty offerors and will instead refer to these parties as Offerors A, B, C, and D respectively.

  Additionally, the sealed Order issued on November 23, 2016, ECF. No. 134, should be considered in conjunction to this Order and Opinion because it clarified the judgment to be entered in accordance with this Order and Opinion.

OPINION AND ORDER

CAMPBELL-SMITH, Chief Judge

This is a post-award bid protest filed by Progressive Industries, Inc. (Progressive or plaintiff) against the United States Department of Veterans Affairs (VA, the agency, or defendant).  Compl. ¶ 1, ECF No. 1, Dec. 22, 2014.  Progressive challenges the VA's source selection decisions awarding firm-fixed price, indefinite-delivery/indefinite-quantity (IDIQ) contracts for the supply of medical cylinder gases to locations and facilities identified by the VA.  See id. ¶¶ 3, 8, 70, 74; see Administrative Record (AR),[2] Tab 59, AR 2360.  Progressive alleges that the VA: (1) treated the offerors unequally; (2) failed to hold meaningful discussions; (3) evaluated the proposals arbitrarily and capriciously; and (4) deviated from the Solicitation's evaluation criteria.  Compl. ¶¶ 25, 32, 41.

On April 16, 2014, the VA issued its source selection decision, awarding the contracts to two veteran owned small businesses,[3] namely [Offeror A] and defendant-

---

[2]      Defendant filed the administrative record (AR) under seal on January 9, 2015.  ECF No. 12.  Plaintiff filed an amended AR under seal on February 4, 2015 (ECF No. 22).  Defendant filed a second amended AR under seal on February 27, 2015 (ECF No. 31), a third amended AR under seal on July 7, 2015 (ECF No. 84), and a fourth amended AR under seal by CD-ROM on December 14, 2015.

[3]      On May 16, 2016, the Supreme Court of the United States issued its opinion in Kingdomware Technologies, Inc. v. United States (Kingdomware), 136 S. Ct. 1969 (2016).  According to the Supreme Court, § 8127(a) of the "Veterans Benefits, Health Care, and Information Technology Act of 2006" requires the VA to award contracts to a service-disabled small business or a veteran-owned small business.  Id. at 1973.  This requirement is triggered by the "Rule of Two," which requires contracting officers to restrict competition to either VOSBs or SDVOSBs when "the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States."  § 8127(d).  The Supreme Court stated that "before contracting with a non-veteran owned business, the [VA] must first apply the Rule of Two."  Kingdomware, 136 S. Ct. at 1977.  But, the Supreme Court declined to determine "precisely what sort of search for veteran-owned small businesses the [VA] must conduct to comply with the Rule of Two."  Id. at 1977 n.4.

The parties have not notified the court of the decision's impact on this case.  Thus, the court does not consider it here.

intervenor in this case, Irish Oxygen, Co. (Irish or defendant-intervenor).  Tab 46, AR 2024; Tab 50, AR 2127; see also Compl. ¶ 74.  Prompted by Progressive's agency level protest, the VA agreed to take corrective action.  The VA reevaluated the proposals submitted by [Offeror A], Irish, and Progressive because the three offerors had been found previously to fall within the competitive range.  As part of its corrective action, the VA considered the offerors' initial proposals, the offerors' November 2013 discussions with the VA, and the offerors' revised proposals.  On November 18, 2014, the VA issued a corrective action source selection decision, again awarding contracts to [Offeror A] and to Irish.[4]  Tab 59, AR 2384-85, see Compl. ¶ 71.

Progressive then filed this protest on December 22, 2014.[5]  Subsequently, the parties filed cross-motions for judgment on the administrative record in accordance with Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).  See Pl.'s Mot. J. AR (Pl.'s Mot.), ECF No. 87, Sept. 25, 2015; Def.-Int.'s Mot. J. AR (Def.-Int.'s Mot.), ECF No. 88, Oct. 30, 2015; Def.'s Mot. J. AR (Def.'s Mot.), ECF No. 89, Oct. 30, 2015; see also Pl.'s Resp. to Def., ECF No. 94, Nov. 20, 2015; Pl.'s Resp. to Def.-Int., ECF No. 95, Nov. 20, 2015; Def.-Int.'s Reply, ECF No. 97, Dec. 18, 2015; Def.'s Reply, ECF No. 98, Dec. 18, 2015; Pl.'s Sur-Reply, ECF No. 99, Dec. 30, 2015.  The court heard three days of oral argument.  At oral argument, plaintiff confirmed that it still was performing a number of the contracts at issue.  Hr'g Tr. 6-7.

At oral argument, it became apparent that the significance of the evaluation criteria and evaluation sequence detailed in the Source Selection Plan (SSP) is a critical source of contention between the parties.  Following oral argument, the court ordered the parties to file supplemental briefing addressing the legal impact, if any, of the agency's evaluation of the offerors in a manner different from what was set forth in the SSP.  The parties filed their briefs, Pl.'s Suppl. Br., ECF No. 117, Def.-Int.'s Suppl. Br., ECF No. 118, and Def.'s Suppl. Br., ECF No. 119.

For the reasons explained below, the court **DENIES** defendant's cross-motion for judgment on the administrative record, **DENIES** defendant-intervenor's cross-motion for

---

[4]    The VA awarded contracts to [Offeror A] for Veteran's Integrated Service Networks (VISNs) 9, 10, 15, and 16 and to Irish Oxygen for VISNs 12 and 23.  The agency made contract awards for six of the seven VISNs expecting to receive medical cylinder gases under the Solicitation.

[5]    Defendant reported on January 9, 2015, that certain contracts had yet to transition to the awardees because either they had lapsed or were due to lapse during pendency of the bid protest (specifically VISNs 9, 12, 15, 16 and 23).  ECF No. 10.  For those contracts, the VA determined it would pursue sole-source procurements with the incumbent distributor of medical gases for the duration of the protest.  As one of the incumbent distributors, Progressive has performed a substantial portion of this work.

judgment on the administrative record, and **GRANTS-IN-PART** plaintiff's motion for judgment on the administrative record.

I.     Background

A.     The Source Selection Plan (SSP)

The contracting officer and designated Source Selection Authority (SSA) for this procurement, Ms. Kimberly Hurt, and the technical evaluation team (TET) chair, Ms. Jodi Cokl, approved the SSP in June 2013.  Tab 9, AR 119, 122.

The SSP was marked: "For Official Use Only Source Selection Information."  Id. at 119-138.  The SSP set forth, inter alia, the procedures for evaluating the received proposals and the type of procurement to be conducted.  Tab 9, AR 119-30.  The VA's objective was to "select the proposal(s) that represents the best value to the Government." Tab 9, AR 122.  As defined in FAR 2.101, "best value" is "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement."

The SSP contained "the source selection criteria and the evaluation procedures used to submit [a] final award recommendation to the source selection authority (SSA)." Tab 9, AR 122.  As set forth in the SSP, each proposal was to be evaluated for the following criteria in the order listed:

1. Technical Capability

2. Relevant Past Performance

3. Veteran's Participation

4. Price

5. "The fifth step will be a series of paired comparisons among offerors, trading off expected value against probable costs in order to determine the best value source selection. In the event that additional capability information is desired before making a source selection, discussions may be held for those offerors with a realistic chance for award (competitive range). Steps two through five will then be repeated to arrive at a final source selection."

Id. at AR 125.

As to the relative importance of the evaluation factors, technical capability was deemed more important than past performance and veterans participation.  Id. at AR 126. Past performance was valued as more important than veterans participation.  Id.  The

4

combination of technical capability, past performance, and veterans participation was valued as "significantly more important than price."  Id.

To aid in evaluating technical capability, the Technical Evaluation Team (TET) "suggested topics for discussions and questions/statements to be presented to offerors in the event discussions [were] to be conducted."  Tab 9, AR 125.

As to past performance, the SSP limited the type of relevant experience to be considered to the followoing:

> [C]ontracts performed in the last three (3) years involving:

> i.   Experience with Medical Gas Supply contracts

> ii.  Demonstrated management of experienced accounts payable and receivable for medical supply contracts.

> iii. Demonstrated ability providing Medical Gases services [sic] to multiple medical facilities preferably within the states of: WV, KY, TN, OH, MI, IL, IN, WI, MO, KS, LA, TX, AR, MS, OK, ND, MN, SD, IA, NE

Tab 9, AR 135-36.

As to veterans participation, each offeror was asked to furnish a representation, modeled on those found at FAR 52.212-3 or 52.219-1, as to whether it qualified as a service-disabled small business ("SDVOSB") or a veteran-owned small business ("VOSB").  Tab 9, AR 138.

As to price, the SSP stated that "[a]fter an evaluation of the Technical Capability, Past Performance, and Veteran Business Participation[] has been completed and rankings have been established[,] price will be compared against these rankings to determine the combination most advantageous to the Government."  Tab 9, AR 129-30.

The SSP further stated that the evaluation team would "identify deficiencies and/or significant weaknesses in an offeror's quote, and record them on the applicable scoring sheet for a particular evaluation factor."  Tab 9, AR. 126.  The SSP defined a "deficiency" using the FAR 15.001 definition; which provides that a "[d]eficiency is a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."  Tab 9, AR 126.  The SPP identified two specific examples of material deficiencies:

- Failure of the offeror to <u>submit required data</u>, which makes it impossible for the Government to evaluate the offeror's technical approach; [and]

- Failure to <u>respond</u> to a specific requirement of the solicitation. Deficiencies shall not be released to offerors until the competitive range is determined and discussions are opened by the Contracting Officer. Discussions provide offerors opportunities to revise and improve their quotes and are provided to offerors in the competitive range in order for them to make amendments and corrections when submitting their quote revisions.

Tab 9, AR 126 (emphasis in the original).  The SSP also made clear that those participating in the source selection process were to "avoid any discussions with offerors regarding proposals or any related matters to preclude even the appearance of favoritism or any other improper action."  Tab 9, AR 123.  As the court evaluates Progressive's challenges to the agency's conduct of the procurement, it gives consideration to the SSP, which is identified in RCFC App. C as one of the "relevant core documents" to be included in the administrative record.

B.    The Solicitation

On July 23, 2013, the VA issued a Request for Proposal (RFP or Solicitation), numbered as VA 240C-13-R-0054, for the supply of medical cylinder gases to locations and facilities within Veteran's Integrated Service Networks (VISNs) 9-12, 15, 16, and 23. Tab 11, AR 161-230.  These VISNs spanned the twenty states that encompass the VA's Service Area Office (SAO) Central Region.  Id. at 216.

The VA intended to award a firm-fixed price IDIQ contract for a base year and four option years.  Tab 11, AR 171, 179.  The VA indicated that it would make its source selection without discussions, as contemplated by FAR 52.212-1(g).[6]  But, by incorporating FAR 52.216-27 into the RFP—which permits single or multiple awards—

---

[6]     FAR Part 52 addresses "Solicitation Provisions and Contract Clauses."  FAR 52.212-1(g) provides the following:

The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

the agency left open the possibility for multiple awards, as it acknowledged in its statement that "[t]he Government intends to award an indefinite delivery – indefinite quantity contract(s) for Medical Gases." Tab 11, AR 179, 201, 211. By subsequent amendment to the RFP,[7] the government expressly broadened the language of the RFP to allow for either a single or multiple awards. Tab 12(d), AR 315.

The evaluation criteria and their relative importance were outlined in the RFP which mirrored what was set forth in the SSP. Compare Tab 11, AR 214-17 with Tab 9, AR 125, 129-30. As stated in the RFP, price would be considered "[i]n determining the competitive range." Tab 11, AR 217. As further stated, price would "be evaluated in terms of fairness and reasonableness." Id.

The RFP also provided that "[a]ny offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers [would be deemed] 'late' and [would] not be considered unless it [was] received before award is made." Tab 11, AR 200. But, the RFP allowed that "a late modification of an otherwise successful offer, that makes its terms more favorable to the Government, [would] be considered at any time it [was] received and [might] be accepted." Id.

As amended, the RFP required the offerors to submit their proposals on CD-ROM, but the offerors could exercise the "OPTION of [also] submitting a printed copy" of their proposals. Tab 12(c), AR 314 (emphasis in the original). Offerors were advised to "include on the CD-ROM all required submittal information as outlined in the solicitation." Id.

C.    Proposal Submissions

Six offerors submitted proposals by the amended closing date of September 27, 2013. See Tab 12(e), AR 316; Tab 21, AR 1177. The offerors were: Irish, [Offeror A], Progressive, [Offeror B], [Offeror C], and [Offeror D]. Tab 21, AR 1177; Tab 31, AR 1320-21.

Progressive contends that in contrast to its initial proposal, which "met all of the [submission] requirements of the Solicitation," (Pl.'s Mot. 13), the manner in which Irish submitted its proposal and the pricing information contained in Irish's submission did not comply with the terms of the Solicitation. Pl.'s Resp. to Def. 3-4.

The AR does not address the manner in which the offerors submitted their proposals. See Tab 12(c), AR 314. But, defendant does not dispute that Progressive submitted a complete proposal on CD-ROM. See Def.'s Reply 7; Hr'g Tr. 26. Without

---

[7]    There were a total of six amendments to the RFP. Tab 12(a-f), AR 284-318.

addressing whether [Offeror A] submitted its proposal on CD-ROM, defendant also admits that "Irish Oxygen never submitted a CD-ROM version of its proposal to the VA." Def.'s Reply 7; see Hr'g Tr. 24. Instead, as the contracting officer reported, "[o]n September 27, 2013, the closing date of the solicitation, Irish Oxygen Co. submitted its initial proposal," by hand delivery. 3d Suppl. Hurt Decl. ¶ 2 (ECF No. 73).

The parties' dispute the legal effect of Irish's paper submission.

As to pricing, Progressive asserts that, unlike the contract awardees [Offeror A] and Irish, it included in its initial proposal pricing information for all of the VISNs listed in the RFP, for both the base year and the four option years. Tab 15, AR 541-712, 724; Tab 21, AR 1177-1180. The AR shows that [Offeror A]'s initial proposal included pricing information solely for VISN 16. Tab 16, AR 962-971. But as to Irish's initial proposal, Progressive insists that it contained no pricing information whatsoever. Pl.'s Resp. to Def. 2-4, 6; Hr'g Tr. 56. Progressive insists that Irish first submitted its pricing information in its revised proposal. Id.

Defendant disagrees. Defendant argues that Irish's "initial [proposal did] include[] pricing for VISNs 12 and 23, but omitted option [year] four pricing." Def.'s Mot. 24 (citing Tab 85, AR 3103-12).

The parties dispute the legal significance of the different pricing information provided by the offerors.

D.     Exchanges with Offerors Preceding the Initial Proposal Evaluations

Progressive also challenges, as unfair, the communications that occurred between the VA and Irish prior to the agency's evaluation of the proposals. The AR indicates that Irish's account manager Ms. Cheryl Jacobson e-mailed a note of gratitude to the VA's contract specialist Ms. Nicole Kutsi[8] on the morning of November 18, 2013 "for [again] allowing us to provide the information you need in order to review the responses." Tab 86, AR 3114. Irish's account manager added that she was sending her "email to avoid any potential delivery issues." Id. Responding on behalf of the VA three minutes later, the contracting specialist wrote: "I have attached the technical portion that will need to be addressed. And if you could please send a list of past performance that would be great too! We will need this information by [close of business] [t]oday, as evaluations start tomorrow." Tab 86, AR 3113.

Less than four hours later that same day, the contracting specialist sent Irish's account manager another e-mail asking Irish to submit "updated pricing for Option year

---

[8]     The contracting specialist's maiden name, Lindstrom, also appears in the AR. Decl. of Hurt ¶ 3 (ECF No. 27).

4, [as Irish's] current pricing only goes to Option year 3." Tab 86, AR 3113.  In a reply e-mail that same afternoon, Ms. Jacobson sent a spreadsheet that included pricing information for option year four.[9] Id.

The next morning, the VA's contracting officer e-mailed Irish's account manager to learn whether Irish's proposal addressed all of the locations within VISNs 12 and 23. Tab 87, AR 3145.  The contracting officer attached to her e-mail "the newest schedule of items that [had been] published in one of the solicitation amendments" and asked Irish to respond by noon that same day.  Id.

As asked, Irish's account manager timely responded on Irish's behalf with another Excel spreadsheet.  Tab 87, AR 3145.  She confirmed that Irish's proposal included all of the locations within VISNs 12 and 23, and she noted that she had "populated the pricing columns in the file you sent."  Id.  The spreadsheet included within the AR appears to contain the information the contracting specialist sought from Irish as to its technical capabilities and past performance.  See Tab 86, AR 3137-3144.

After receiving the information sought from Irish, the agency began the evaluation process.

E.      Evaluation of Initial Proposals and Award Decision

The TET convened in Minneapolis, Minnesota on the afternoon of November 19, 2013, to evaluate the offerors' proposals.  Suppl. Hurt Decl. ¶ 43 (ECF No. 41).  Using the Technical Capability Evaluation Sheet included in the SSP, each TET member completed a handwritten evaluation of each offeror's technical capability, past performance, and veterans participation.  Tabs 17-19, AR 994-1167; Tab 72, AR 2543-62; Suppl. Hurt Decl. ¶¶ 39, 49 (ECF No. 41).  According to Ms. Hurt, "the TET [members] submitted their individual evaluation sheets to the TET Chair, and the TET Chair convened a meeting to reconcile [the] disagreements and varying ratings among the evaluators."  Id. at ¶ 39; see also id. at ¶ 43.  The TET Chairperson, Ms. Cokl, drafted for the contracting officer a consensus evaluation memorandum summarizing the TET's findings.  Tab 21, AR 1177-80.

Rather than recommending that the contracting officer eliminate certain offerors before establishing the competitive range, the TET itself eliminated two offerors, [Offeror B] and [Offeror C], from further consideration.  Tab 21, AR 1178.  The TET reasoned that [Offeror B] and [Offeror C] had failed to submit "[t]he majority of information requested for evaluation in the RFP."  Id.  [Offeror B] had "offered spotty coverage" in VISNs 12, 15, and 16, and [Offeror C] had "offered spotty coverage" in VISNs 10, 11, 12, 15, 16, and 23.  Id.  Neither of the two offerors included in their

---

[9]      The content of this attachment appears to be located at Tab 86, AR 3115-3136.

subcontracting plans either a VOSB or SDVOSB.  Id.  Moreover, the TET took issue with certain terms and conditions of the two offerors' proposals.  Id.

The TET consensus evaluation memorandum's findings are summarized below:

| Factor 1: Technical Capability | | | | | | |
|---|---|---|---|---|---|---|
| Offeror | [Offeror A] | Progressive | [Offeror B] | [Offeror C] | [Offeror D] | Irish |
| TET Consensus | Excellent | Excellent | Fair | Fair | Fair | Fair |

| Factor 2: Past Performance | | | | | | |
|---|---|---|---|---|---|---|
| Offeror | [Offeror A] | Progressive | [Offeror B] | [Offeror C] | [Offeror D] | Irish |
| TET Consensus | Excellent | Good | Excellent | Neutral | Good | Neutral |

Tab 21, AR 1177-78.  Only Irish and [Offeror A] received credit for factor 3, veterans participation.  Id. at 1178.  As to factor 4, price, the TET consensus evaluation memorandum indicated that "[p]ricing [would] be evaluated separately."  Id.

Also included in the TET consensus evaluation memorandum were the evaluation summaries for the proposal of each offeror that remained within the competitive range. Tab 21, AR 1178-79.  In the summary the TET found that "[o]verall, [Irish's] proposal was lacking relevant information."  Id. at AR 1179.  The TET found that Irish had failed to provide any information supporting its claim of having 99.8% proficiency at delivering products punctually.  Id.  Moreover, Irish "[d]idn't provide any information related to how [it] would administer the contract."  Id.

The summaries for [Offeror A] and Progressive were more favorable than for Irish.  The TET found [Offeror A]'s proposal to be a "[v]ery detailed outline of their capabilities, which met or exceeded the statement of work.  Id.  The TET also found that [Offeror A]'s "[c]ustomer feedback was very positive."  Id.  On a further positive note, the TET appreciated Progressive's ability to service "extensive locations nationwide" and Progressive's "description of how [it would] meet [the VA's] needs and [demonstrated] an understanding of the [statement of work]."  Id.

After establishing the competitive range, the TET determined that discussions were needed to continue the source selection process.  The TET then created discussion topics "based on each offeror's proposal strengths, weaknesses, and deficiencies."  Tab

21, AR 1179.  Among the identified topics to be discussed with Irish, Progressive, and [Offeror A] were: (1) the offeror's capabilities, to include supplying other VISNs detailed in the Solicitation; (2) the offeror's transition plan; (3) the offeror's contingency plan; (4) the offeror's pricing schedule; (5) the offeror's use of distribution centers and medical suppliers; and (6) the offeror's licensing, insurance, and invoicing flexibility.  See Tab 23, AR 1291.1 (Irish); Tab 24, AR 1295 (Progressive); Tab 25, AR 1300 ([Offeror A]).

    F.    Discussions and Revised Proposals

    On November 21, 2013, the agency held discussions with the remaining offerors. Tabs 23-29, AR 1289-1309.  Then, the contracting officer made her competitive range determination and formally eliminated [Offeror B] and [Offeror C] from further consideration.  Tab 31, AR 1325.

    As is reflected in the following excerpted table from the post-discussion technical evaluation consensus memo, Irish benefited most from the agency's discussions with the offerors.

| Factor 1: Technical Capability | | | |
|---|---|---|---|
| Offeror | [Offeror A] | Progressive | Irish |
| TET Consensus | Excellent | Fair | Good |

Tab 30, AR 1310-12.  Most notably, Progressive's rating dropped from excellent to fair and Irish's increased from fair to good.  Id.  [Offeror A]'s rating remained the same.  Id. The past performance ratings for these offerors also remained the same as in the initial technical evaluation consensus memorandum.  Compare Tab 41, AR 1888, with Tab 21, AR 1178.

    The remaining offerors were asked, by letter, to submit revised proposals by "no later than 3:00 PM [Central Time], on December 19, 2013." [10]  See Tabs 32-34, AR 1327-1336.  Referencing FAR 15.307 which addresses "Proposal revisions," id. at AR 1333, 1327, 1329, the letter to the offerors made clear that if no revised proposal was submitted, the "evaluation for award [would] be made based on the initial proposal."  Id. at 1328, 1330, 1334.

---

[10]    [Offeror D] was not eliminated from the competitive range.  But the documents related to its discussions and revised proposal were absent from the AR and were not deemed necessary for the court's evaluation.  See Tab 31, AR 1325 (including [Offeror D] within the competitive range).

At the request of [Offeror A]'s president, the VA granted an extension of time for the submission of its revised proposal.  The contracting specialist enlarged the filing deadline for [Offeror A] only, from 3:00 PM on December 19, 2013 to 10:00 AM, on December 20, 2013.  Tab 34, AR 1334; Tab 98, AR 3215-16.  [Offeror A]'s president had explained to the VA that his company was "deep into finalizing this proposal and [was] request[ing]…[an] extension for our electronic submission."  Tab 98, AR 3216.  [Offeror A]'s president subsequently acknowledged the VA's extension of time, with a note in the post script of his e-mail response of "Thank you Santa!"  Id. at 3215.  [Offeror A] submitted its revised proposal by the extended deadline of December 20, 2013.  Tab 37, AR 1737-1743.

 G. Source Selection and Corrective Action Source Selection Decisions

On April 14, 2014, the contracting officer made the initial source selection decision, recommending contract awards to [Offeror A] for VISNs 9, 10, 11, 15, and 16, and contract awards to Irish for VISNs 12 and 23.  Tab 45, AR 2024.

Receiving notice that it was an unsuccessful offeror on April 16, 2014 (Tab 47, AR 2027), Progressive filed an agency level protest the next day.  Tab 49, AR 2031-2111.  The VA agreed to take corrective action. Tab 51, AR 2137.  By November 18, 2014, the VA had reevaluated the offerors' proposals and issued a corrective action source selection decision that mirrored the VA's initial source selection decision. Tab 59, AR 2384-85.  On reevaluation, the VA again awarded contracts to [Offeror A] and Irish. Id.

Both the source selection decision and corrective action source selection decision state that the offers were evaluated using the same five-step process described in the SSP. Tab 45, AR 2015; Tab 59, AR 2370.  But the records reflect differences between the evaluation methods described in the SSP and the evaluation method used to reach the corrective action source selection decision.  The first step of the evaluation in both the source selection decision and the corrective action source selection decision was modified to include a determination of "the acceptability of each offer by evaluating the consistency of each Offeror's promises with the [RFP's] terms and conditions."  Id. Also, the iterative process described in the SSP—which provided that only past performance, veterans preference, and price (steps two through five), would receive reevaluation by the agency—seems to have been omitted from the process that led to the source selection decision and the corrective action source selection decision.  Tab 9, AR 125.  Moreover, step two of the process set forth in the SSP—which involved an assessment of past performance—was changed to an assessment of technical capability. Tab 45, AR 2015; Tab 59, AR 2370.  Finally, the source selection decision and the corrective action source selection decision wholly eliminated step three in the SSP, the consideration of veterans participation.  Tab 45, AR 2015; Tab 59, AR 2370.

H.    The Parties' Positions

In its complaint before the court, Progressive protests the VA's original evaluation of the offerors' proposals and the VA's contract awards to Irish and [Offeror A].  See Compl. ¶¶ 90-169 (Counts 1-3).  Progressive asks the Court to terminate the VA's contracts with [Offeror A] and Irish, and to direct the award of the contracts to itself. Compl. ¶ 176(c-d).

On September 25, 2015, Progressive filed a motion for judgment on the AR (Pl.'s Mot.), asserting that both the VA's initial award and corrective action "were irrational, arbitrary, capricious, an abuse of discretion and otherwise in violation of regulations, procedure and other applicable law."  Pl.'s Mot. 1-2.

On October 30, 2015, the government and defendant-intervenor filed their respective cross-motions for judgment on the AR and responses to plaintiff's motion for judgment on the AR.  The government asserts that plaintiff is not entitled to injunctive relief because the relevant legal factors favor the government.  Def.'s Mot. 43-48 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).  Irish asserts that the VA acted reasonably and properly exercised the discretion afforded in a best value procurement by selecting it as the awardee for supplying VISNs 12 and 23.  Def.-Int.'s Mot. 14 (citing ManTech Telecomm. & Info. Sys. Corp. v. United States (ManTech), 49 Fed. Cl. 57, 64 (2001), aff'd per curiam, 30 F. App'x 995 (Fed. Cir. 2002)).

The matter is now ripe for a ruling.

II.    Legal Standards

A.    Standing

The court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  The court's "bid protest" jurisdiction encompasses the following types of agency actions:  "(1) pre-award protests (i.e., objections 'to a solicitation by a Federal agency for bids or proposals for a proposed contract' or award); (2) post-award protests (i.e., objections to 'the award of a contract'); and (3) any 'alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'"  Sheridan Corp. v. United States, 95 Fed. Cl. 141, 148 (2010) (quoting 28 U.S.C. § 1491(b)(1)).

To establish standing under the Tucker Act, a protestor must establish that it qualifies as an "interested party."  See 28 U.S.C. § 1491(b)(1); Weeks Marine, Inc. v.

United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  The Federal Circuit has
"construe[d] the term 'interested party' in § 1491(b)(1) . . . [to be] limited to actual or
prospective bidders or offerors whose direct economic interest would be affected by the
award of the contract or by [the] failure to award the contract."  Am. Fed'n of Gov't
Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  Thus, "to come within the
Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [a protestor] is
required to establish that it (1) is an actual or prospective [offeror], and (2) possesses the
requisite direct economic interest."  Rex Serv. Corp. v. United States, 448 F.3d 1305,
1307 (Fed. Cir. 2006).  "[T]o establish a direct economic interest in the procurement, a
protester must demonstrate prejudice."  Boston Harbor Dev. Partners, LLC v. United
States, 103 Fed. Cl. 499, 503 (2012) (citing Myers Investigative & Sec. Servs., Inc. v.
United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002)).

        A protestor's showing of prejudice differs depending upon the nature of the
protest.  In a post-award bid protest, a protester demonstrates the requisite prejudice by
showing that it would have had a "substantial chance" of receiving the contract award but
for the alleged errors in the procurement process.  That is, a post-award protestor must
show that its "chance of securing the award must not have been insubstantial."  Info.
Tech. & Appls. Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  In a post-
award bid protest, a "showing of a mere possibility that the protester would have received
the contract but for the error is inadequate to show prejudice."  Data Gen. Corp. v.
Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see CW Gov't Travel, Inc. v. United
States, 110 Fed. Cl. 462, 481 (2013); Linc Gov't Servs., LLC v. United States, 96 Fed.
Cl. 672, 691 (2010); Rex Serv., 448 F.3d at 1308.

        Neither defendant nor defendant-intervenor has challenged plaintiff's standing in
this matter.  Progressive was an actual bidder and was included in the competitive range
for the contract award.  The court finds that Progressive has satisfied the substantial
chance requirement and has standing to bring this protest.

        B.      Standard of Review

        The Administrative Procedure Act (APA) standard of review applies to the court's
examination of an agency's contract award decision.  Thus, the court will not set aside an
agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law."  5 U.S.C. § 706(2)(A) (2012).  Rule 52.1 permits the court to
review an administrative record and to rule on a motion for judgment on that record.
RCFC 52.1(c).

        "Under the APA standard . . . 'a bid award may be set aside if either (1) the
procurement official's decision lacked a rational basis; or (2) the procurement procedure
involved a violation of regulation or procedure.'"  Banknote Corp. of Am., Inc. v. United
States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting Impresa Construzioni Geom.
Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Plaintiff must

make its showing by a preponderance of the evidence.  See, e.g., AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004).

The Supreme Court has counseled that:

[u]nder the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' Citizens to Preserve Overton Park v. Volpe, [401 U.S. 402, 416 (1971)].

Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974); see also Weeks Marine, Inc., 575 F.3d at 1368-69 (stating that under rational basis review, the court will "sustain an agency action evincing rational reasoning and consideration of relevant factors") (internal quotation marks omitted).

The court's analysis of a "bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The court must first determine whether the agency acted either in an arbitrary and capricious manner, without a rational basis, or contrary to law.  Id.  If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial.  Id.

An agency is entitled to considerable deference in negotiated "best-value" procurements.  See e.g., ManTech, 49 Fed. Cl. at 64.  "[I]n a negotiated procurement, [if] an offeror's proposal does not comply with the solicitation's requirements, 'an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal.'"  ManTech, 49 Fed. Cl. at 71 (quoting D & M Gen. Contracting, Inc., B–252282 et al, 93–2 CPD¶ 104, at 3 (Comp. Gen. Aug. 19, 1993)); see also Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 3442 (2009) ("a technically unacceptable proposal may be considered for award if the proposal would otherwise be competitive and if its technically unacceptable terms can be cured by the offeror in a revised proposal.").

Moreover an agency is afforded broad discretion in various aspects of the procurement process.  Thus, "a court will not second guess . . . such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  But, the agency must articulate a "rational connection between the facts found and the choice made….if the agency's path [can] reasonably be discerned," the court will "uphold a decision of less than ideal clarity." Motor Vehicle Mfrs. Ass'n of United States v. State Farm Ins. Co., 463 U.S. 29, 43 (1983) (internal citations omitted).

III.     Discussion

Progressive challenges the agency's substantive evaluation of the proposals and identifies a number of technical errors the VA committed.  However in the court's view, more problematic is the VA's: (1) inconsistent treatment of the offerors when it established the competitive range; and (2) grant of an extension of time only to [Offeror A] for the submission of its revised proposal.  The record shows that the agency did not treat the offerors equally, and the court finds that the unequal treatment of the offerors prejudiced Progressive.  Moreover, the court is unable to discern from the record when and how the agency evaluated the pricing of the offerors' proposals.  Although not the most important facto to be considered, the agency was to consider it.  Unable to review the agency's price evaluation, the court cannot make a finding that the agency acted rationally.

The court addresses these issues in turn.

A.     The Court Does Not Disturb the Discretionary Decisions Made By the
         Procurement Officials

Progressive asserts that the VA: (1) conducted an unreasonable evaluation of the submitted proposals, Pl.'s Mot. 25-27, 33-36; (2) engaged in discussions although it had indicated that it would not, Id. at 21, 25-27; and (3) addressed matters that exceeded the scope of permissible communication with the offerors.  Id.  Unhappy with many aspects of the procurement, Progressive has brought an exhaustive protest that includes many of the details and minutiae in the procurement process that the court is directed not to "second guess."  E.W. Bliss Co., 77 F.3d at 449.  For the sake of completeness, however, the court addresses Progressive's various challenges.

Unsatisfied with the VA's evaluation of the respective offerors' past performance, Progressive points to the disparity between its own wide-ranging experience, Tab 15, AR 490-540, and the limited prior experience of [Offeror A], Tab 16, AR 855-866, 957-960, and of Irish, Tab 14, AR 398-403, 449-455.  Progressive adds that Irish failed to provide any past performance materials in its initial proposal.  Pl. Mot. 35.  As was proper, the TET first assigned Irish a neutral rating for its past performance.  But, after learning more from the offerors during the well-documented discussions, the VA adjusted their past performance ratings—as well as their technical capability ratings.  As to both factors, Progressive's ratings fell.  Because the VA's reasons for its findings were supported by the record, the court finds no error.

Progressive complains that the VA employed discussions as a means of allowing Irish and [Offeror A] to submit "pricing for VISNs that were not part of their initial proposal."  Pl.'s Mot. 27.  Progressive contends that the VA's additional discussions with [Offeror A] and Irish about their contingency plans and their transition plans were improper because these topics were not among the subfactors enumerated in the RFP.

See Tab 11, AR 215-17.  But, the VA advised the offerors, by letter, of the topics it had developed to assist it in evaluating the strengths, weaknesses, and deficiencies of the respective offerors.  See Tab 21, AR 1177-80 (the TET's pre-discussion consensus memo); Tab 23, AR 1291.1-2 (Irish); Tab 24, AR 1294-96 (Progressive); Tab 25, AR 1299-1301 ([Offeror A]).  The agency then discussed the same topics with each of the offerors in the competitive range.  See Tab 29, AR 1308-09.  The court finds no error in the scope of these agency discussions with the offerors.

Progressive claims that the VA did not comply with the FAR when it failed to document its reasons for holding discussions, after stating that it would it make the contract award(s) without discussions.  Pl. Mot. 26 (citing the FAR 15.306(a)(3) ("Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals without discussions. If the solicitation contains such a notice and the government determines it necessary to conduct discussions, the rationale for doing so shall be documented in the contract file.").

But, in both the SSP and the RFP, the VA had reserved the right to conduct discussions.  Tab 9, AR 125-26 (the SSP directed the TET to develop discussion questions); see Tab 11, AR 162, 201; see also Banknote Corp. of Am., Inc., 365 F.3d at 1353 ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.").  Moreover, the VA did offer a rationale for the conduct of discussions when it established the competitive range.  The agency explained that "the primary objective of . . . discussions was to maximize the Government's ability to obtain best value, based on the requirement[s] and the evaluation factors set forth in the solicitation."  Tab 31, AR 1326; see Hr'g Tr. 243.  Progressive's argument is unavailing.

Progressive also suggests that it was treated unfairly during discussions with the agency about the topics identified by letter to the respective offerors.  Pl.'s Mot. 25-27; Hr'g Tr. 190.  But the record shows that Progressive gave a number of unimpressive responses to the agency's questions and those answers compromised the agency's view of its technical capability and past performance.  Tab 30, AR 1311.  For example, the agency found that Progressive "didn't seem to understand the logistical operations of their subcontractor's delivery procedures" or "infection control requirements."  Tab 30, AR 1311.  Progressive does not persuade the court on this point.

The court declines Progressive's invitation to exercise hindsight and to criticize these various reasoned determinations by the procuring agency.  See E.W. Bliss Co., 77 F.3d at 449.

B.      The VA Permissibly Waived the CD-ROM Submission Requirement

The third amendment to the RFP required the offerors to submit their proposals on CD-ROM.  Tab 12(c), AR 314.  Irish submitted its initial proposal in paper form.  3d

Suppl. Hurt Decl. ¶ 2 (ECF No. 73); Hr'g Tr. 424.  Progressive argues that by doing so, Irish's submission failed to comply with the terms of the RFP.  Pl.'s Resp. to Def. 3 n.3; Pl.'s Sur-Reply 4 n.1.

Defendant asserts that the contracting officer properly exercised her broad discretionary authority under FAR 52.212-1(g) to "waive informalities and minor irregularities in [the] offers received."  Hr'g Tr. 25; Def.'s Reply 6.  Defendant adds that the language in the Solicitation is permissive rather than mandatory, as it states: "Nonconformance with the instructions provided…**may** result in an unfavorable proposal evaluation."  Tab 11, AR 203 (emphasis added); Hr'g Tr. 24-25; Def.'s Reply 6.

Progressive insists that a requirement that has become the subject of an amendment to the RFP cannot be recast, at defendant's later convenience, as a mere informality.  Hr'g Tr. 35-36; see Pl.'s Mot. 15-16.  Plaintiff relies on the Federal Circuit's guidance in E.W. Bliss Co. that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."  Pl.'s Sur-Reply 5 (quoting E.W. Bliss Co., 77 F.3d at 448).

FAR Part 15 does not define the terms "informalities" and "minor irregularities" that appear in FAR 52.212-1(g).  Defendant asserts that in such a circumstance, courts have looked to other provisions of the FAR for definitional guidance, and defendant points the court to FAR 14.405, which defines "[a] minor informality or irregularity [as] one that is merely a matter of form and not of substance."  Def.'s Reply 6-7.  Defendant also points to case law to support its position.  Electronic On-Ramp, Inc. v. United States, 104 Fed. Cl. 151, 166 (2012) (citing Centech Group, Inc. v. United States, 554 F.3d 1029, 1038 (Fed. Cir. 2009)).  In Electronic On-Ramp, Inc., the court considered the manner in which an offeror submitted its proposal.  The court found that "the timely submission of one complete copy of a proposal via an accepted transmission method [was sufficient to] satisfy the requirement for timely delivery."  104 Fed. Cl. at 167.

The court finds that, consistent with FAR 14.405 and FAR 52.212(1)(g), the agency properly exercised its discretion in waiving, as an informality, the submission format requirement.

C.      As to Other Aspects of the Procurement Process, the VA Acted Either Without a Reasoned Explanation or In a Manner Contrary to Law

The AR shows that the VA engaged in exchanges with Irish that allowed Irish to make material alterations to its proposal.  The AR also shows that the VA treated the offerors differently as it established the competitive range.  Moreover, the VA failed to provide a reasoned explanation as to how it performed its price analysis and the court cannot discern from the AR how the agency did so.

The court addresses these matters in turn.

      1.      Unequal and Unlawful Exchanges with Irish Prior to the TET's Evaluation of the Offerors' Initial Proposals

Progressive argues that the e-mail exchanges on November 18 and 19, 2013, between Irish's account manager, the VA's contract specialist, and the contracting officer were violative of the FAR. FAR 15.306(b)(2) prohibits the use of "communications . . . to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal." FAR 15.306(b)(3) provides that "communications shall not provide an opportunity for the offeror to revise its proposal." A violation of either of these FAR provisions also might constitute a violation of FAR 15.306(e)(1), which specifically prohibits an exchange that "[f]avors one offeror over another." See Hr'g Tr. 97-99; 127.

The two day period of email exchanges in November 2013—which preceded the agency's evaluation of the offerors' proposals—shows that Irish had pricing issues, among other issues, in its initial proposal. Tab 86, AR 3113, 3128; Tab 87, AR 3145. Irish, in fact, admitted at oral argument that its initial proposal lacked pricing information for option year four for VISNs 12 and 23. Hr'g Tr. 203-05. But, even after Irish revised its initial proposal to include pricing for an additional option year, the contracting officer still could not discern whether the proposal encompassed all of the locations for VISNs 12 and 23. Tab 87, AR 3145. The contracting officer then forwarded to Irish, in electronic form, the "newest schedule of items that was published in one of the solicitation amendments." Id. Defendant and defendant-intervenor explained at oral argument that the excel document that the VA formatted and sent to Irish contained an embedded formula that altered Irish's pricing. Tab 87, AR 3161; Hr'g Tr. 131-36, 143-44.

Progressive characterizes Irish's omission of key components, to include certain pricing information from its initial proposal, as a material deficiency. Pl.'s Mot. 14-15.

Defendant disagrees, asserting that Irish's "omission of option [year] four pricing from its initial proposal [for example] did not render [its] proposal unacceptable because FAR 15.306(b)(3) permits communications between the Government and offerors," after the receipt of proposals if such communications are intended to "address[] ambiguities in the proposals or other concerns such as perceived deficiencies, errors, omissions, or mistakes." Def.'s Mot. 24. Defendant characterizes Irish's use of the "wrong schedule of items . . . [as] a mistake." Hr'g Tr. 139-40. Defendant adds that even if "the VA improperly permitted Irish Oxygen to submit option [year] four pricing, Progressive was not prejudiced because it [too] was included within the competitive range." Def.'s Mot. 24.

The TET's consensus evaluation memorandum does not address either the shortcomings in Irish's initial proposal or the exchanges between the VA and Irish that occurred before the TET began evaluating the proposals.  Tab 21, AR 1177-80; Tab 86, AR 3113.  But the TET's consensus evaluation memorandum does address the TET's elimination of two offerors, [Offeror B] and [Offeror C], from the competitive range due to the "spotty coverage" of the various VISNs proposed by the two offerors.  Tab 21, AR 1177-80.

Progressive insists that Irish unfairly had an opportunity to fix its critical problems before the TET evaluated its proposal.  Plaintiff argues that instead of allowing Irish to address its deficiencies prior to the establishment of the competitive range, the agency should have excluded Irish from the competitive range as it excluded [Offeror B] and [Offeror C].  Hr'g Tr. 409; see Pl.'s Mot. 14-15.

Irish responds that "the V.A. had the discretion, if not a duty, to allow Irish to correct [minor technical errors or deficiencies] under applicable case law, and [to] include Irish within the Competitive Range."  Def.-Int.'s Reply 6-7; see Hr'g Tr. 204-05 (pointing to the government's duty to give an "offeror an opportunity to correct…material or critical deficiencies…if that bid is potentially going to provide the best value to the Government.").  Irish defends its inclusion in the competitive range citing Guardian Moving & Storage Co. v. United States (Guardian), 122 Fed. Cl. 117, 129 (2015).

In Guardian, the procuring agency engaged in meaningful discussions with one offeror, but not another.  122 Fed. Cl. at 129-30.  Because the agency was required to hold meaningful discussions with all the offerors (not just a subset of offerors), it later took corrective action by reopening the technical discussions and requesting revised proposals from all of the offerors.  Id. at 124-25, 129.

The Solicitation at issue in this case incorporated FAR 52.212-1(g) and stated that an "offeror's initial [proposal] should contain the offeror's best terms from a price and technical standpoint" because the "[g]overnment intends to evaluate offers and award a contract without discussions with offerors."  Tab 11, AR 201.  Irish's assertion that the government had a duty to notify Irish of its material deficiencies does not square with the VA's discretion "to make an award based on initial offers received, without exchanges of such offers."  See Tab 11, AR 215; see also Def.-Int.'s Mot. 7 ("If, as Progressive contends, the bid from Irish contained 'no relevant information,' without doubt it would have been summarily rejected and excluded from the competitive range.").  But, even if the court were to assume arguendo that the government had a duty to hold discussions with Irish to correct the material deficiencies in its proposal, the VA's duty to hold exchanges would have extended to all the offerors, not only to Irish.  See Guardian, 122 Fed. Cl. at 129-30.

Irish's ability to modify aspects of its proposal before the agency's initial evaluation also calls into question the "late is late" rule. FAR 52.212-1(f)(2)(i) provides that, "[a]ny offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered unless it is received before [an] award is made." See Tab 11, AR 161 (the Solicitation incorporated FAR 52.212-1 by reference); see also Johnson Controls Government Sys., LLC v. United States, 125 Fed. Cl. 289, 293 (2016) (upholding an agency's rejection of an offeror's proposal when the offeror failed to timely and fully submit its proposal electronically using a third party submission portal).

The "late is late" rule does not apply in circumstances in which "the [c]ontracting [o]fficer determines that accepting the late offer would not unduly delay the acquisition" and "[t]here is acceptable evidence to establish that [the proposal] was received at the Government installation designated for receipt of proposals and was under the Government's control prior to the time set for receipt of offers." FAR 15.208(b)(1)(ii); see Electronic On-Ramp, Inc., 104 Fed. Cl. at 159 n.5 (describing the three additional exceptions to the "late is late" rule in a negotiated procurement).[11] "Acceptable evidence to establish the time of receipt at the Government installation" may include "oral testimony or statements of Government personnel." FAR 52.212-1(f)(3). In this case, the contracting officer's declaration that Irish timely submitted its initial proposal, by hand delivery, satisfies this requirement. 3d Suppl. Hurt Decl. ¶ 2 (ECF No. 73).

This exception to the "late is late" rule is limited by FAR 52.212-1(f)(2)(ii), which allows the consideration and acceptance of "a late modification of an **otherwise successful offer**." (emphasis added). In the VA's corrective action source selection decision, the agency acknowledged the serious deficiencies in Irish's initial proposal, stating specifically that Irish's "initial proposals didn't include a lot of the required information, the subsequent discussions clarified a great deal, and the revised proposal included all requested/required information." Tab 55, AR 2294. Progressive argues that the exchanges between Irish and the VA show that Irish did not provide, among other things, a narrative of its technical ability in its initial proposal. Pl.'s Mot. 18 (referencing

---

[11]    The FAR sets forth three additional exceptions to the "late is late" rule in a negotiated procurement, which are: (1) an electronic proposal that was transmitted and received "not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals" (FAR § 15.208(b)(1)(i)); (2) a submitted proposal that "was the only proposal received" (FAR 15.208(b)(1)(iii)); and (3) a submitted proposal that due to "an emergency or unanticipated event [that has] interrupt[ed] normal Government processes[,] [could not] be received at the Government office designated for receipt of proposals by the exact time specified in the solicitation." (FAR 15.208(d)). These exceptions are not applicable here.

Tab 85, AR 3102).[12]  Progressive adds that without Irish's exchanges with the VA and its subsequent modifications, it was unlikely to have made an "otherwise successful offer.  See Tab 21, AR 1178 (the TET eliminating two offerors from the competitive range as a result of incomplete information in the offerors' initial proposals).  Thus, the exception to the "late is late" rule most relevant in this case does not apply.  See FAR 52.212-1(f)(2)(ii).

The "late is late" rule prohibits an agency from accepting proposal modifications or revisions after the deadline established by the agency.  FAR 52.212-1(f).  As noted by the Federal Circuit, "[t]here are inherent competitive advantages to submitting a proposal after all other parties are required to do so," including the ability to make "last minute changes to the proposal."  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1381 (Fed. Cir. 2009).  The VA's exchanges with Irish allowed the offeror to make untimely and significant modifications to the technical and cost elements of its proposal.  These exchanges unfairly favored Irish over the other offerors.  See id.; FAR 15.306(e)(1) (prohibiting exchanges that "[f]avors one offeror over another.").

2.    The TET's Establishment of the Competitive Range was Arbitrary, Capricious, and Did Not Comport with the Applicable Law

The TET seems to have made the competitive range determination that the contracting officer later ratified.  See Suppl. Hurt Decl. ¶ 44 (ECF No. 41).  ("the TET recommended that discussions needed to occur in order for the TET to make an award recommendation . . . . [t]he Contracting Officer determined which offerors would remain in the competitive range.");  Tab 31, AR 1325 (the contracting officer adopted the TET's ratings without further analysis in establishing the competitive range).  The TET provided reasoning for the competitive range determination it made.  But the RFP and FAR 15.306(c)(1)[13] charge the contracting officer, not the TET, with establishing the competitive range.  Tab 9, AR 126; see also Suppl. Hurt Decl. ¶¶ 56-57 (ECF No. 41).

---

[12]    There is no record that this document was contained in original filing of Irish's initial proposal.  Tab 14, AR 321-455.  There is a reference, however, to Irish's supplier/partner Matheson Gas.  Tab 14, AR 398, 407.

[13]    FAR 15.306(c)(1) provides the following:

The Agencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range. Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section.

By delegating this authority to the TET, the contracting officer not only violated the RFP and FAR 15.306(c)(1), but more importantly, the contracting officer also seems to have kept from the TET's awareness the significant deficiencies that were identified in Irish's initial proposal.  See Tab 21, AR 1179 (there is no mention of the VA's exchanges with Irish in the TET's evaluation consensus memo).  Had the TET considered Irish's proposal as initially submitted—prior to Irish receiving prompting from the VA contract specialist to address the technical portion of its proposal, to furnish a list of past performance, and to include updated pricing for option year four <u>before</u> the agency conducted its initial evaluation—the TET might have excluded Irish from the competitive range, as it did [Offeror B] and [Offeror C].  By drawing to Irish's attention the shortcomings in its proposal prior to the evaluation process—the time at which the agency indicated that it would identify the respective strengths and weaknesses of the submitted proposals that would inform the competitive range determination—the agency did not abide by its own procurement procedures.

The Federal Circuit has stated, "[w]hen procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion." <u>Doty v. United States</u>, 53 F.3d 1244, 1251 (Fed. Cir. 1995); see <u>PGBA, LLC v. United States</u>, 60 Fed. Cl. 196, 207 (2004), <u>aff'd</u> 389 F.3d 1219 (Fed. Cir. 2004).   In the view of the court, by failing to address the problematic aspects of Irish's initial proposal, at the time prescribed in the procurement process, the agency committed such a procedural violation.

3.     The TET's Evaluation of the Offerors' Initial Proposals Did Not Comport with Either the Solicitation or the Applicable Law

The SSP stated that "[p]rice [would] be compared against [the other evaluation factors] to determine the combination most advantageous to the Government." Tab 9, AR 129-30.  The RFP stated that "[i]n determining the competitive range, price [would] be considered." Tab 11, AR 217.  The RFP also stated that "[price would] be evaluated in terms of fairness and reasonableness." <u>Id.</u>

The AR contains an undated one-page document, entitled "Price Evaluations (Initial Award)," that details each offerors' pricing for the VISNs they proposed to service. Tab 22, AR 1181.  The document shows that the offerors were not ranked substantively, but by their individually quoted prices. Tab 31, AR 1326.  Because, the document includes pricing for Irish's proposal to service VISNs 12 and 23 for option year four, it appears to have been prepared after the VA's e-mail exchanges with Irish on November 18 and 19, 2013.  Hr'g Tr. 204-05; see Tab 86, AR 3113, 3128; Tab 87, AR 3145.

In the TET's consensus evaluation memorandum, the agency indicated that "[p]ricing [would] be evaluated separately." Tab 21, AR 178.  Although the SSP and the RFP indicate that the non-price evaluation factors were significantly more important than

price, price was to be evaluated nonetheless.  See Tab 9 AR 126; Tab 11, AR 217.  From the record, however, it is not clear when and how the TET evaluated this factor.  Id.

The record shows that the VA's Contract Review Board (CRB), which is tasked with reviewing the agency's high dollar value procurements to ensure compliance with acquisition policies and procedures, expressed concern that price had not been addressed before the competitive range was established.  Tab 94, 3197-98.  The CRB specifically questioned the adequacy of the agency's documentation of its evaluation methods, writing to the contracting officer:

> According to the [FAR,] to establish Price Reasonableness you need to have a comparison of pricing.  The table that you have provided [Tab 45, AR 2022] is unclear [as to] how you are comparing pricing, since each Offeror proposed completely different sites to service.  I would maybe provide multiple tables, one for each VISN.  That would give a better picture as to why you believe the price is reasonable.  Also to make your justification stronger, I would add a column to include your [Independent Government Cost Estimate].

Tab 94, AR 3199.

Responding to the CRB's concerns, the contracting officer wrote that FAR 15.306(C) and FAR 15.305(a) allowed "price . . . not [to be] evaluated until after [the] revised proposals were submitted."  Tab 97, AR 3211.  Although, the contracting officer's response was "[c]orrected" later, the March 14, 2014 source selection decision was not.  Tab 45, AR 2022.  In her corrected response, the contracting officer explained that even if a price evaluation were deemed necessary, no meaningful evaluation could have occurred before the competitive range determination.  See Tab 9, AR 129-30; Tab 11, AR 217.  However, the contracting officer's position does not comport with the terms of the RFP, which provided that the competitive range would be established after price had been evaluated "as part of the total proposal…in order to determine the overall best values to the Government."  Tab 31, AR 1326.  By determining the competitive range prior to evaluating price, the agency did not adhere to the requirements of the Solicitation.  See e.g., Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd 365 F.3d 1345 (Fed. Cir. 2004) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.").

The agency also violated the FAR.  FAR 15.306(c)(1) requires that "the contracting officer establish a competitive range comprised of all of the most highly rated proposals…[b]ased on the ratings of each proposal **against all evaluation criteria**." (emphasis added).  But the VA did not do so.

Moreover, FAR 15.308 requires documentation of the source selection decision and such documentation should "include the rationale for any business judgments and

tradeoffs **made or relied on** by the SSA, including benefits associated with additional costs." (emphasis added).  The VA failed to do this as well.

The contracting officer did perform a tradeoff analysis in the corrective action source selection decision, but she did not address how the proposed pricing for the various VISNs was assessed.  Tab 59, AR 2381-85.  Nor can the court discern from the record how the agency evaluated the pricing in each offeror's proposal based on the offerors' different plans to service assorted VA locations.  See Tab 22, AR 1181-1288; Tab 45, AR 2022; Tab 56, AR 2296.  Even assuming, arguendo, that the price evaluation charts reflect a comparison of the competing offerors, the charts contain no rationale—as FAR 15.308 requires.  See Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. 723, 735 (2011) ("To be well documented, the [source selection decision] must contain more than conclusory and generalized statements.") (internal citations omitted).

The VA's price comparison, if performed at all, is very poorly documented in the corrective action source selection decision, as is reflected by the CRB's recommendation that the agency provide a more detailed price comparison of the various VISNs the offerors proposed to service.  Without any record of a meaningful price comparison by the agency, the court cannot discern the agency's rationale for its source selection decision.  Nor can the court find the VA's decision to establish the competitive range— without first evaluating price—either to have been rational or in accordance with law. Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 115-116 (2006) (invalidating a competitive range determination because contracting officer failed to consider price, as required in the solicitation).

> D.    The Agency Unfairly Extended the Time For the Submission of a Revised Proposal to Only One Offeror

The deadline for submitting the final revised proposals was "3:00 PM [Central Time], on December 19, 2013."  See Tabs 32-34, AR 1327-1336.  [Offeror A] sought and received a one-day extension.  Tab 98, AR 3215-16.  It submitted its revised proposal on the morning of December 20, 2013.  Tab 37, AR 1737-1743.  Framing [Offeror A]'s request for an extension of time as an improper discussion with the VA, plaintiff challenges the agency's action.  Pl.'s Mot. 20; Pl's Resp. 20-27.

Defendant asserts that the contracting officer's decision to accept [Offeror A]'s late revised proposal was a permissible exercise of discretion.  Def.'s Mot. 19 (citing Information Tech. & Applications Corp., 316 F.3d at 1323 ("We recently emphasized that the acquisition regulations entrust the contracting officer with especially great discretion, extending even to [her] application of procurement regulations.") (internal quotations and brackets omitted).  In support of its position, defendant relies, in part, on Guardian Moving & Storage Co. v. United States (Guardian), 122 Fed. Cl. 117, 134-35 (2015).  In Guardian, the court found that an agency's emails responding to, and granting, an offeror's request for an extension of time did not constitute "discussions" under FAR

15.306(b).  Id. at 135.  But, the agency in Guardian extended its deadline for revised proposals to all offerors, not just the requesting offeror. 122 Fed. Cl. 117, 135.

The court in Guardian distinguished its facts from those in another case, Geo–Seis Helicopters, Inc. v. United States (Geo–Seis), 77 Fed. Cl. 633 (2007).  In Geo–Seis, the court found "that the contracting officer [had] contravened the 'late is late' rule because [he lacked the] authority to accept the late proposal revision and…after the deadline had passed, [to] issue a post-hoc extension," to only one offeror.  Guardian, 122 Fed. Cl. 117, 134 n.7 (citing Geo–Seis, 77 Fed. Cl. at 640-46).

Plaintiff argues that both the Guardian and Geo–Seis decisions compel a finding that the VA's extension of the proposal submission deadline solely for [Offeror A] violated FAR 52.212–1(f)(2)(i).  Pl's Sur-Reply 8-9.  The court agrees.

The VA treated [Offeror A] differently and—in effect—preferentially by extending its submission deadline, without offering a correlative extension to the other offerors.  It is not clear to the court that [Offeror A] would have been able to complete and to submit its revised proposal without the extension it received because, as [Offeror A]'s president explained in its request for more time, [Offeror A] was "deep into finalizing [its] proposal." Tab 98, AR 3216.  But what is clear is that [Offeror A] received a benefit that the other offerors did not when the agency afforded it additional time to prepare its submission.  It is this type of unfair treatment that is expressly prohibited under FAR 3.101-1.

E.      The VA's Conflicting Descriptions of the Reevaluation Process Do Not Permit the Court to Assess the Rationality of the Agency's Actions

Ordinarily, in the circumstance of a post-award bid protest, the court examines whether the procuring agency has evaluated the proposals and made an award decision in a manner that comports with the stated criteria in the Solicitation and in accordance with the FAR.  See Banknote Corp. of Am., Inc., 56 Fed. Cl. at 386.  In this case, however, a key source of contention between the parties centers on the evaluation procedures and the operative factors set forth in the SSP, rather than in the Solicitation.  The court has held previously that internal agency documents such as the SSP confer no rights upon offerors. Mantech, 49 Fed. at 67 (internal citations to GAO decisions omitted).

Review of the AR indicates that the agency deviated, without a written explanation, from the evaluation procedures prescribed by the SSP, and the rationale for the VA's departure cannot be discerned from the record.  In evaluating the legal effect of the agency's actions, the court looks to the history and purpose of SSPs, as well as the expanding role of SSPs in judicial review of procurement decisions.

1.      The Purpose and History of SSPs

The only mention in the FAR of this particular document is in the definition of the term "source selection information."  FAR 2.101.  Prior to the rewrite of FAR Part 15 in 1997, FAR 15.612 required a SSP for all "formal" source selections, which generally applied to high-dollar-value acquisitions.  Among other requirements, FAR 15.612(3)(c)(5) specifically directed the SSP to contain "[a] description of the evaluation process, methodology, and techniques to be used."

The court's rules identify the SSP as one of the "relevant core documents" to be included in the administrative record that the agency must produce early in a bid protest action to "expedite final resolution of the case."  RCFC App. C, 22(b).  The SSP may assist the court in understanding why an agency took a particular action.  In Avtel Services v. United States, 70 Fed. Cl. 173, 216-17 (2005), the court looked to the SSP's rating method, which was not included in the solicitation, to determine whether the agency had acted rationally—and in conformity with the FAR—when it evaluated the offerors' proposals.  Id. at 216.  Similarly, in Marine Hydraulics Intern., Inc. v. United States, 43 Fed. Cl. 664, 675 (1999), the court found that the contracting officer had exercised his independent judgment, "in complete consistency with the Source Selection Plan," when he considered the recommendations of the Best Value Advisory Committee and compared each proposal "against all [the] source selection criteria."  Id.

Although SSPs are widely used by agencies for source selection, and are mandatory for certain types of acquisitions under DFARS 215.303(b)(2), their use is no longer required by the FAR.  The FAR has no requirement that an agency disclose its "rating methods" in a solicitation.  Instead, an agency only need describe its "general approach for evaluating past performance information."  FAR 15.304(d).

2.      The Expanding Role of SSPs in Judicial Review of Procurements

Historically, the purely internal use of SSPs led the Claims Court to conclude that "when rules and regulations are promulgated for the benefit of the government and no one else, the other party to a contract cannot complain if such regulations are not complied with."  C & L Constr. Co. v. United States (C & L), 6 Cl. Ct. 791, 804 (1984) (citing Perkins v. Lukens Steel Co. (Lukens Steel), 310 U.S. 113, 129, (1940); Hartford Accident & Indemnity Co. v. United States (Hartford Accident), 130 Ct. Cl. 490, 492-94, (1955)).  The court and the "GAO [have] repeatedly held that [source selection] plans generally do not give outside parties any rights and, thus, provide no basis for departing from the requirements of a solicitation….[and thus] it appears the Source Selection Plan has little, if any, bearing in defining the rights of the parties under the Solicitation."  Mantech, 49 Fed. Cl. at 67 (internal citations to GAO decisions omitted).  The court has added that "the elements of a source selection plan are not considered to provide procedural requirements that are binding on a procuring agency."  Huntsville Times Co. v. United States, 98 Fed. Cl. 100, 107 (2011) (citing Mantech, 49 Fed. Cl. at 67).  The

intended use of a SSP as an internal agency resource appears to have influenced the court's restrictive interpretation of its legal effect.  Manson Constr. Co. v. United States, 79 Fed. Cl. 16, 19 (2007) ("Internal agency documents that are not distributed as part of a solicitation do not themselves confer rights to potential offerors."); see also Lincoln Servs. Ltd. v. United States (Lincoln Services), 230 Ct. Cl. 416, 428-30 (Ct. Cl. 1982) (noting that an agency's deviation from its own internal guidance to be arbitrary and capricious if such deviation results in prejudicial error).

Plaintiff asserts that an agency's departure from the evaluation criteria and procedures provided by the SSP "can undermine the rationality of the ultimate source selection decision."  Pl.'s Supp. Br. 5-6 (citing USfalcon, Inc. v. United States, 92 Fed. Cl. 436, 452-456 (2010)).  Plaintiff asserts that the VA's departure from the SSP in the corrective action source selection decision prejudiced Progressive and was arbitrary, capricious, and contrary to law.  Id. at 7.

Relying on a series of cases, defendant argues that the VA's deviation from the SSP does not furnish a ground for Progressive to protest.  See Def.'s Suppl. Br. 2-3 (citing Allied Tech. Group, Inc. v. United States, 94 Fed. Cl. 16, 41 (2010); ManTech, 49 Fed. Cl. at 67; Atlantic Diving Supply, Inc. v. United States, 107 Fed. Cl. 244, 263 (2012)).  Defendant claims that "noncompliance with the terms of an SSP cannot serve as the basis for a bid protest unless the SSP is incorporated into the solicitation."  Id.

As the case law reveals, the court has looked to prepared SSPs in certain limited circumstances.

In Pikes Peak Family Housing, LLC v. United States, 40 Fed. Cl. 673, 678 (1998), the court found three unexplained inconsistences between the SSP and the procurement. The inconsistencies included a misapplication of the SSP's definitions for rating criteria, a failure to categorize the proposals according to their acceptability, and prolonged delays in notifying offerors excluded from the competitive range.  Id. at 678-79.  These discovered inconsistences prompted the court to allow the AR to be supplemented with additional documents so that the court could perform its review.  Id. at 678.

The court , however, exercises care not to review a SSP as it would a solicitation. Rather it looks to the SSP to evaluate the rationality of the agency's departure from its procurement plan.  The court may consider whether the deviations from the SSP are reasoned departures.  USfalcon, Inc., 92 Fed. Cl. at 454 ("Because the SSA relies on the evaluators working for him to follow source selection plan mandates, departures from the plan could undermine the rationality of the ultimate source selection decision.").

When the AR reveals a disparity between the SSP and the solicitation, the court will examine the record further to find the agency's expressed rationale for the divergence or to understand the circumstances that led to the change in the evaluation criteria or procedures.  Such variance is not necessarily indicative of an irrational agency

action. As the court observed in USfalcon, Inc., 92 Fed. Cl. at 454, "if no reason is given for departing from a source selection plan….[the] departure could be due to error and the resulting ratings [might] be different than the evaluators intended." While the court noted that an agency's failure to follow the SSP could be shown in certain circumstances to have been irrational, it found in that particular case that the agency had complied with the evaluation procedures and criteria set forth by the SSP. USfalcon, Inc., 92 Fed. Cl. at 462; but see Fort Carson Support Services v. United States, 71 Fed. Cl. 571, 592-93 (2006) (stating that '[u]nless an element of the SSP is expressly waived by an official with the power to do so, via a valid, articulated reason, the failure to follow that element is, by its very nature, an arbitrary act."); United Int'l Investigative Servs. v. United States, 41 Fed. Cl. 312, 314-15 (1998), aff'd, 194 F.3d 1335 (Fed. Cir. 1999) (table) (finding that the agency's deviation from the internal procedures "deprived [the] plaintiff of the opportunity to have its proposal considered fairly and honestly"); Beta Analytics International, Inc. v. United States, 67 Fed. Cl. 384, 407-408 (2005) (looking to the procedures set forth in the SSP, the court found that an agency's departure from those procedures resulted in unequal treatment of the protestor.) The cases show that the court has considered deviations from the SSP that cast doubt on either the rationality or the fairness of the procurement process.

Here, the court relies upon more than the agency's deviation from the procedures set forth in the SSP to conclude that it cannot make a finding that the VA's corrective action source selection decision was a rational one. The court makes this conclusion based on the agency's inability to describe its own evaluation procedures in a clear or consistent manner.

In this bid protest, the contracting officer offered an affidavit describing evaluation procedures that differed from those set forth in the corrective action source selection decision, Compare Suppl. Hurt Decl. ¶ 40 (ECF No. 41), with Tab 9, AR 125, and Tab 59, AR 2370-71, and at oral argument, the VA struggled to explain the difference between the procedures in the SSP and the procedures followed to make the corrective action source selection decision. See Hr'g Tr. 23. The corrective action source selection decision itself made no mention of how the agency reevaluated the proposal. Nor can the court reconcile the rationale offered in the corrective action source selection decision with the contracting officer's explanation.

Although the court may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, the marked inconsistencies between the evaluation procedures described in the SSP, the corrective action source selection decision, and in the contracting officer's affidavit do not permit the court to follow the agency's path.

Here, the agency appears to have adopted different procedures from those set forth in the SSP—without explanation as to why or how it did so. Compare Tab 9, AR 125, with Tab 45, AR 2015-16; Tab 59, AR 2370.

Thus the court looks to the SSP, at defendant's invitation, to evaluate the rationality of this procurement process.  See Avtel Servs., 70 Fed. at 216-17;  see Def.'s Mot. 6-8.

> ### 3.   The VA Misstated the Evaluation Procedures Set Forth in the SSP in Its Corrective Action Source Selection Decision

Defendant relies on the SSP to show that the agency contemplated both establishing a competitive range and holding discussions.  Def.'s Mot. 18.  Defendant further relies on the SSP to justify the contracting officer's position on price analysis. Def.'s Mot. 8-9; Hr'g Tr. 78 (citing Tab 45, AR 2022-24; Tab 59 AR 2381-85), 108.

But, the VA's reevaluation of technical capability did not comport with the evaluation methodology set forth in the SSP.  See Tab 9, AR 125.  As provided in the SSP, only past performance, veterans preference, and price (steps two through five), would receive reevaluation by the agency. Tab 9, AR 125; see Pl.'s Mot. 23-24. Addressing the agency's deviation from the SSP, defendant explained that the SSP contained a typographical error and that "[t]he contracting officer meant to indicate that the technical capacities, as well as past performance…would be part of that iterative process."  Hr'g Tr. 23; Def.'s Mot. 5 n.3.  But, the Solicitation did not address the reevaluation of technical capability.  Tab 11, AR 214-17.

The contracting officer referenced the SSP in her description of the TET's evaluation methods.  She stated that "the first step required by each TET member [in evaluating the revised final proposals] was an evaluation of the technical capability of each offeror."  Suppl. Hurt Decl. ¶¶ 39-40 (ECF No. 41).  This described process differs from the iterative process described in the SSP—which did not provide for the reevaluation of technical capability.  See Tab 9, AR 125.  The additional steps the contracting officer described were incongruent with the procedures found in the SSP and with the corrective action source selection decision.  Compare Suppl. Hurt Decl. ¶ 40, with Tab 9, AR 125, and Tab 59, AR 2370.

Progressive asserts that the VA acted in contravention of the SSP by revisiting the technical capability factor after conducting the initial evaluation. Pl. Mot. 23-24 (citing Tab 9, AR 125; Tab 45, AR 2015).  Essentially, Progressive asks the court to disallow any deviation from the evaluation criteria and methods set forth in the SSP, in the agency's reevaluation of the offerors' technical capability as part of its corrective action. See Tab 59, 2376.

Defendant maintains the position that VA "did not deviate from the SSP by reevaluating the technical capability factor after the competitive-range determination." Def.'s Supp. Br. 4.  The VA explained at oral argument that the disparity between the evaluation procedures of the SSP and those documented in the corrective action source selection decision "is . . . an issue of form over substance."  Hr'g Tr. 23.  Defendant

points to the sentence in the SSP addressing the possibility of reevaluating technical capability after the competitive range determination: "In the event that additional capability information is desired before making a source selection, discussions [might] be held for those offerors with a realistic chance for award (competitive range)." Def.'s Suppl. Br. 5 (citing Tab 9, AR 125).  Defendant insists that the placement of that sentence before the instruction that only past performance, veterans preference, and price (steps two through five) would receive agency reevaluation makes clear that the phrase "[s]teps two through five" is a typographical error.  Def.'s Suppl. Br. 5 (citing Tab 9, AR 125). Defendant's explanation for the disparity between the contracting officer's characterization of the five-step evaluation process in the corrective action source selection decision—which was derived purportedly from the SSP—and those described in the SSP is summary and unsupported.  Compare Suppl. Hurt Decl. ¶ 40, with Tab 9, AR 125, and Tab 59, AR 2370.[14]

Although the contracting officer states in her supplemental affidavit that the TET's first step in reevaluating proposals was to assess the offerors' technical capability, Suppl. Hurt Decl. ¶ 40 (ECF No. 41), the first step described in the corrective action source selection decision was "a determination of the acceptability of each offer by evaluating the consistency of each Offeror's promises with the terms and conditions in the RFP." Tab 59, AR 2370.  The corrective action source selection decision also described technical capability comprised of: (1) individual evaluations; and (2) "an overall group consensus on findings leading to a competitive range."  Id.  The two-phased process identified in the corrective action source selection decision does not include a reevaluation, but instead incudes a fifth procedural step involving "comparisons among Offerors, [and] trading off expected value against price in order to determine the best value source selection."  Id.[15]  Moreover, the corrective action source selection decision misstated the evaluation procedures of the SSP and failed to set forth the rationale for reevaluating the proposals.  The evaluation procedures that were detailed in the corrective action source selection decision also differed from what was described in the contracting officer's supplemental affidavit.

---

[14]    Defendant properly noted during oral argument that the corrective action source selection decision is the only document under active consideration as it represents the agency's final award decision in this procurement.  Hr'g Tr. 244.

[15]    The five-step iterative reevaluation process was described in the SSP as "a series of paired comparisons among offerors, trading off expected value against probable costs in order to determine the best value source selection. In the event that additional capability information is desired before making a source selection, discussions may be held for those offerors with a realistic chance for award (competitive range). Steps two through five will then be repeated to arrive at a final source selection."  Tab 9, AR 125.

Looking to the SSP to understand how the VA arrived at its corrective action source selection decision, the court finds the explanation for the disparity between the evaluation procedures as described in the contracting officer's affidavit and those found within the corrective action source selection decision to be wanting.  Compare Suppl. Hurt Decl. ¶ 40 (ECF No. 41), with Tab 9, AR 125, and Tab 59, AR 2370.  The agency's own inability to describe, with consistency, the evaluation process it used is tellingly indicative of the lack of clarity in the record as to this aspect of the procurement.  Given the inadequacy of the agency's explanation, the court cannot make a finding that the agency acted rationally in its evaluation of the proposals.

F.     The VA's Actions Prejudiced Progressive

Progressive's initial technical capability and past performance evaluation scores— as well as its inclusion within the competitive range—positioned it to have had a "substantial chance" to receive a contract award.  Tab 21, AR 1177-78.  See C.A.C.I., Inc. v. United States, 719 F.2d 1567, 1574–75 (1983).  Plaintiff asserts that but for Irish's inclusion within the competitive range, Progressive likely would have received an award. See Labatt Food Serv., Inc., 577 F.3d at 1378 ("A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract.") (internal citations omitted).

Defendant claims that Progressive suffered no prejudice because it, like the contract awardees, fell within the competitive range and remained under consideration for award during the pendency of the procurement process.  Def.'s Reply 11 (citing Labatt Food Serv., Inc., 577 F.3d at 1379 (requiring an "allegation of an error that, taken as true, would be prejudicial to the complaining party's attempt to procure the contract")). Defendant argues that it was Progressive's own lackluster performance during discussions—not unfair treatment—that led the VA to make the best-value awards to Irish and [Offeror A].  See Hr'g Tr. 427.  Defendant asserts that effectively Progressive is equating prejudice with "the mere existence of competition."  Def.'s Reply 11.

Even if the court were to accept defendant's claims as true, the court is persuaded that the VA compromised the competitive fairness of this procurement by granting [Offeror A] an extension of time to submit its revised proposal and thus, maintain its eligibility to be considered for a contract award.  Moreover, the agency compromised the competitive fairness of the procurement by allowing Irish to address the type of gaps in its proposal that were deemed problematic for other offerors—who were not afforded a similar opportunity to address their marked gaps in information and thus were excluded from the competitive range.

Whether [Offeror A] could have met the filing deadline without the extension it received is uncertain.  Also uncertain is whether Irish would have been included in the competitive range if it had not been afforded an opportunity to cure the shortcomings in its initial proposal.  It is these allowances by the agency, as well as the manner in which

the agency conducted the reevaluation, that call into question the fairness of the procurement process and the rationality of the agency's award decision.  The court finds these errors to have been prejudicial.

IV.   Permanent Injunction

Pursuant to the Tucker Act, the court may award "any relief that the court considers proper, including declaratory and injunctive relief" in bid protest cases.  28 U.S.C. § 1491(b)(2) (2012).  To decide whether a permanent injunction is warranted,

> the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc., 554 F.3d at 1037 (citing PGBA, LLC, 389 F.3d at 1228-29.

No individual factor carries dispositive weight, and the court must "weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."  Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 513 (Fed. Cir. 1990) (discussing preliminary injunctions).[16]

Progressive seeks to enjoin the VA from awarding the contracts at issue to Irish and [Offeror A].[17]  As the court has found, Progressive has prevailed on the merits of its claim.  See supra Part III.F.  Thus, the court considers, in turn, the remaining factors that inform the appropriateness of injunctive relief.

A.   Irreparable Harm

"When assessing irreparable injury, '[t]he relevant inquiry…is whether plaintiff has an adequate remedy in the absence of an injunction.'"  CW Gov't Travel, 110 Fed. Cl. 462, 494 (2013) (quoting Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000)) (internal citation omitted).  Irreparable harm is satisfied when denying injunctive

---

[16]   There is no relevant difference between the standards for a preliminary injunction and a permanent injunction.  See Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

[17]   Plaintiff also asks the court order to terminate the awarded contracts and to make the award to Progressive.  See Pl.'s Mot 37-38.  This request exceeds the court's authority.  See United Int'l Investigative Servs., 41 Fed. Cl. at 323-24.

relief would cause a protestor to "lose a valuable contract that it has lawfully won." Sys. Application & Techs., Inc., v. United States, 100 Fed. Cl. 687, 720-21 (2011).

Defendant argues that for a showing of irreparable harm, more than a mere showing of lost profits is required; rather, the alleged loss must be sufficiently severe that it threatens the survival of the movant's business. Def.'s Mot. 46 (citing Bannum, Inc. v. United States, 56 Fed. Cl. 453, 456 (2003) ("[o]nly in extraordinary circumstances, such as the prospect of insolvency or an inability to collect damages, will monetary damages alone give rise to irreparable harm")) (citing 11A Charles Alan Wright, Arthur R. Miller, & Mary Kane, Federal Practice and Procedure (Wright and Miller 1995) § 2948.1 (1995) (additional citations omitted)).

Defendant misrelies on Bannum. Bannum addressed the standard of irreparable harm for a pre-award bid protest. 56 Fed. Cl. at 456. Moreover, Bannum relied on a section from the Wright and Miller text addressing the legal standards for granting or denying preliminary injunctions. Id.; see Wright and Miller 1995 at § 2948.1. As updated, this text now provides that "[w]hen the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kane, Federal Practice and Procedure (Wright and Miller 2013) § 2948.1 (2013). The court rejects defendant's mischaracterization of the legal standard for irreparable harm for a permanent injunction. See Caddell Constr. Co., Inc. v. United States, 111 Fed. Cl. 49, 115-16 (2013) (declaring that decisions of this court have "recognized that, in some circumstances, the loss of a business opportunity, coupled with an unfair procurement process, may result in irreparable harm to a plaintiff") (internal citations omitted).

Progressive proposed to service all of the VISNs listed in the RFP, and included, in both its initial and revised proposals, pricing information for the base and four option years as to each VISN. Tab 15, AR 541-712, 724; Tab 21, 1177-1180. Progressive is the incumbent contractor and the loss of the opportunity to supply even one of the VISNs will cause Progressive to suffer economic harm. See Pl.'s Mot 37. Progressive has no remedy, other than this protest, to reclaim the contract and any profits it would have earned. For this reason and because the court also has found elements of unfairness in the agency's conduct of this procurement, it is the court's view that Progressive will suffer irreparable harm in the absence of an injunction.

B.     The Balance of Hardships

When evaluating the balance of hardships, the court must weigh the irreparable harm plaintiff would suffer without an injunction against the harm an injunction would inflict on defendant and defendant-intervenor. See Sheridan Corp. v. United States, 94 Fed. Cl. 663, 670 (2010) (citing Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715-16 (2006)).

The court acknowledges that plaintiff, as the incumbent contractor, has benefited from its continued performance on a substantial portion of the work covered by the Solicitation during the pendency of this bid protest.  See n.5 supra.  This work includes continuing to supply medical cylinder gases to various VA locations within VISNs 12 and 23, a number of which sites were to be serviced by the contract that the VA awarded Irish in its corrective action source selection decision.  Sheridan Corp., 94 Fed. Cl. at 670; Tab 59, AR 2384-85.

Progressive asserts that had the VA performed its source selection in accordance with the SSP and the FAR, Irish would have been eliminated from the competitive range. Hr'g Tr. 402.  Progressive adds that it "had a very good chance of receiving the contract for all of the VISNs in all locations, just like they had proposed," as "[Offeror A] had only submitted a proposal for [VISN] 16."  Id.

Defendant counters that because the VA's "best-value determination was reasonable and adequately documented," the agency would be harmed by the grant of injunctive relief.  Def.'s Mot. 46.  Defendant adds that "Progressive hasn't established any prejudice [and asserts that]….there's an extensive discussion in the contracting officer['s] source selection decision as to the reasons why the Government believed that Progressive's [sic] final proposal revisions were insufficient or inadequate."  Hr'g Tr. 416-17 (citing Tab 59, AR 2383-84).

The VA's arguments do not persuade.  Defendant relies on the VA's corrective action source selection decision, in which the agency addressed why it selected [Offeror A] and Irish over Progressive.  But the errors that occurred earlier in the procurement process tainted the later stages of the agency's procurement process.  See Tab 59, AR 2383-84.  As previously discussed, the agency afforded Irish an opportunity to address gaps in its initial proposal without providing a similar opportunity to the other offerors. In addition, the agency extended to [Offeror A] additional time for the submission of its proposal without affording the other offerors a correlative extension.  Moreover, the agency has given conflicting descriptions of the evaluation procedures it used to reevaluate the offerors' technical capability during the corrective action process.  While the court considers the burden that a permanent injunction would inflict upon the VA, "[f]rom the Court's view, these alleged harms are of the agency's own making." Sheridan Corp., 94 Fed. Cl. at 670.

On this record, the balance of hardships militates in favor of Progressive.

C.     Public Interest

The public has a strong interest in ensuring that the government procurement process is fair.  PGBA, LLC, 60 Fed. Cl. at 221; PCI/RCI v. United States, 36 Fed. Cl. 761, 776 (1996) (holding that the public's interest in protecting the integrity of the

procurement system from irrational conduct was served by granting a permanent injunction).

Defendant points to the VA's corrective action source selection decision to support the agency's contract awards.  Def.'s Mot. 47 (citing Tab 59, AR 2384-85).  But defendant ignores the lack of equal treatment given to the offerors.

The public, and in this case the veteran recipients of medical support, are well served by the procurement of medical cylinder gases for various VA locations by means of a competitive marketplace.  When offerors compete to provide the best value for needed goods and services, they are expected to meet the requirements of the Solicitation or risk elimination from consideration.  This is particularly true when, as in this case, discussions between the government and offerors are not anticipated, and no opportunity to cure an otherwise insufficient proposal is expected.  See FAR 52.212-1(g); Tab 11, AR 161-62.  If one or more offerors—but not all—are afforded special treatment, the competitive nature of the procurement and, in turn, the marketplace are compromised.  See PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003) ("[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.").

The court was prevented from making findings as to the rationality of certain agency action in this procurement due to inadequate documentation and explanation in the AR.  In particular, the court was unable to review the agency's consideration of the price component of the offers, as well as the manner in which it conducted the reevaluation of the revised offers.  Moreover, the VA's inconsistent treatment of the offerors when it established the competitive range and its election to grant an extension of time only to [Offeror A] for the submission of its revised proposal do not serve the government's procurement system well.

Here, the public's interest in ensuring the integrity and fairness of the procurement process outweighs the public's interest in permitting the VA to conduct its source selection with prejudicial errors and evidence of unequal treatment of the offerors.

V.   Conclusion

For the reasons discussed fully above, plaintiff's motion for judgment on the administrative record is **GRANTED-IN-PART**, and is otherwise denied, defendant's cross-motion for judgment on the administrative record is **DENIED**, and defendant-intervenor's cross-motion for judgment on the administrative record is **DENIED**.  Plaintiff's request for injunctive relief is **GRANTED-IN-PART**, and is otherwise denied.  The Clerk of Court shall enter judgment accordingly.

IT IS SO ORDERED.

         s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge